UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 07 CR 20002 |
| v. | ) |
| | ) |
| GERARDO LUGO, | ) |
| | ) |
| Defendant. | ) |

## MOTION TO VACATE JURY VERDICT AND GRANT A NEW TRIAL AS A RESULT OF A *BRADY* AND *GIGLIO* VIOLATIONS BY THE GOVERNMENT

**NOW COMES**, the Defendant, **GERARDO LUGO**, by and through his attorney, **GAL PISSETZKY**, and respectfully submits this Memorandum in support of his Motion to Vacate Judgment and Grant a New Trial. In support of his motion, Mr. Lugo states as follows:

### STATEMENT OF FACTS

On January 4, 2007, Gerardo Lugo was indicted on three counts. Count 1 of the indictment reads as follows, "From at least about 2003 or before and continuing until about August 2006, in the Central District of Illinois, the defendants, Jose C. Rios and Gerardo Lugo, knowingly and intentionally conspired with each other and others to distribute and to possess with the intent to distribute a controlled substance, namely, 5 kilograms or more of a mixture or substance containing cocaine, a Schedule II controlled substance. As part of the conspiracy, the defendants regularly distributed cocaine and caused others to distribute cocaine, often on a front or consignment basis, in Kankakee,

Illinois are. All in violation of Title 21, United States Code, Sections 846, 841(a)(1) and (841(b)(1)A).

Count 3 of the indictment reads as follows, "On or about June 9, 2005, in the Central District of Illinois, the defendant, GERARDO LUGO, Knowingly and intentionally distributed a controlled substance, namely, a mixture or substance containing cocaine, a Schedule II controlled substance. All in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(c).

Count 4 of the indictment reads as follows, "On or about January 25, 2006, in the Central District of Illinois, the defendant, GERARDO LUGO, Knowing and intentionally distributed a controlled substance, namely, a mixture or substance containing cocaine, a Schedule II controlled substance. All in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(c)."

In its investigation of Mr. Lugo and others for the charges in the above-referenced indictment, the government used several law enforcement agencies, including the Drug Enforcement Agency ("DEA") and the Kankakee Area Metropolitan Enforcement Group ("KAMEG"), to conduct surveillance, make arrests, and arrange undercover purchases of narcotics through the use of confidential sources. In many instances, individuals that law enforcement arrested during its investigation became and were used as confidential sources. DEA and KAMEG used these individuals in undercover operations and to gather information. However, before a confidential source could be utilized by DEA and KAMEG, they had to sign a Confidential Source Agreement that forbids them from using, selling or dealing with any illegal drugs or committing any other crime.

Throughout the course of its investigation, DEA and KAMEG learned that at least two of its confidential sources, Robert O'Deneal (KAMEG 05CS027, DEA #CS-05-119448) and Christopher Morrissette (KAMEG # 04CS051, DEA #CS-05-117561 ), violated their Confidential Source Agreements and continued to conduct drug transactions without the knowledge or consent of law enforcement. At some point, the DEA determined that these two confidential sources were no longer trustworthy and deactivated both Robert O'Deneal and Christopher Morrissette. Nevertheless, KAMEG continued to use both Christopher Morrissette and Robert O'Deneal for the duration of its investigation leading up to the arrest of Mr. Lugo in August of 2006. Although the DEA had deactivated Christopher Morrissette and Robert O'Deneal at some point during in its investigation of Mr. Lugo, the DEA continued to work closely with KAMEG who was still relying on the information provided by both confidential sources.

At no point before or during the trial against Mr. Lugo did the government disclose to defense counsel that the DEA or any other law enforcement agency involved in the investigation, had deactivated these two confidential sources because of violations of their cooperating agreements with law enforcement. Additionally, the government never provided defense counsel with law enforcements' files on each confidential source, which would have revealed their deactivation and other performance reports on each confidential source.

On May 15, 2007, the second day of trial, the government called Christopher Morrissette to testify as a cooperating witness. The government used Morrissette to introduce several crucial pieces of evidence in trying to link Mr. Lugo to the alleged drug conspiracy, including evidence relating to count 4 of the indictment. While Morrissette

testified, the government did not elicit any testimony that would have informed Mr. Lugo that Morrissette was deactivated by the DEA or that KAMEG deemed him untrustworthy. Moreover, Mr. Lugo did not learn that Christopher Morrissette was deactivated by the DEA until after his trial concluded when the government's lead case agent, DEA Special Agent Tyrolia Collins, told Mr. Lugo's counsel in passing.

On the third day of trial, the government called Robert O'Deneal as a cooperating witness. The government used O'Deneal's testimony to link Mr. Lugo to the alleged drug conspiracy, including evidence related to count 3 of the indictment. Again, the government elicited no testimony from O'Deneal that revealed that he was deactivated by DEA during the investigation for violating his cooperating agreement with law enforcement. It was not until the eighth day of trial, after the government had rested its case, when Mr. Rios called Special Agent Collins to testify did Mr. Lugo learn that O'Deneal was deactivated during the investigation by DEA. This information was never disclosed to Mr. Lugo by the government, but was the result of testimony elicited by defense counsel for Mr. Lugo. The government never disclosed the specific reasons as to why Morrissette and O'Deneal were deactivated and found to be untrustworthy by law enforcement. The government never turned over any relevant information as to Morrissette and O'Deneal's prior violations of their Confidential Source Agreements. And most important, the government failed to even mention that their two star witnesses, Morrissette and O'Deneal were deemed untrustworthy by DEA and KAMEG.

**ARGUMENT**

**THE GOVERNMENT'S FAILURE TO DISCLOSE IMPEACHING EVIDENCE ABOUT TWO COOPERATING GOVERNMENT WITNESSES IS A CLEAR BRADY VIOLATION**

Under Brady v. Maryland, and its progeny, the suppression of evidence by the prosecution favorable to an accused violates due process where the evidence is material to either the guilt or punishment of the accused, irrespective of the good faith or bad faith of the prosecutor. 373 U.S. 83, 87 (1963); Strickler v. Greene, 527 U.S. 263, 280 (1999); Kyles v. Whitley, 514 U.S. 419, 432-434 (1995); United States v. Bagley, 473 U.S. 667, 674-675 (1985). Kyles v. Whitley, 514 U.S. 419, 432 (1995). The Supreme Court further extend its ruling in *Brady* as it relates to the Due Process Clause of the Fifth Amendment of the Constitution, and held that although a prosecutor has no duty to provide defense counsel with unlimited discovery of everything know to him, a prosecutor does have a constitutional duty to disclose exculpatory evidence to a defendant even if no such request is made when evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed. United States v. Agurs, 427 U.S. 97, 96 (1976); Bagley, 473 U.S. at 680 ("Court also ruled that there was no difference between "specific request" and "general request" situations, the government's responsibility to produce *Brady* materials is neither heightened nor relaxed by the presence or absence of a written *Brady* request or a motion to compel, and the government has an ongoing burden to provide material exculpatory evidence whenever it discovers that it has such information in its possession.").

Additionally, in Giglio v. U.S., the Supreme Court held evidence subject to *Brady* is not limited to exculpatory evidence and extends to evidence the defense might have used

to impeach the Government's witnesses; the government's failure to produce this evidence was held to constitute a violation of the Due Process clause. 405 U.S. 150, (1972). United States v. Wilson, 481 F.3d 475, at 480 (7th Cir. 2007) ("Suppressed evidence that could have been used to impeach a government witness can affect the outcome if it is not cumulative of other impeachment at trial.")

To establish a *Brady* violation three elements must be satisfied: (1) the prosecution must suppress or withhold evidence, (2) which is favorable, and (3) material to the defense. Moor v. Illinois, 408 U.S. 786, 792 (1972). Moreover, favorable evidence is always material and a constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 472 U.S. at 682.

In this case, the government committed a *Brady* violation when it withheld evidence from Mr. Lugo that was both favorable and material. Had the government provided Mr. Lugo the impeaching information about Morrissette and O'Deneal, including the fact that they were deactivated by DEA, found to be untrustworthy by Both DEA and KAMEG and the law enforcements' files of the confidential sources, there is a very strong probability that the result of the trial would have been different. As a result of this *Brady* violation, Mr. Lugo is entitled to a new trial.

> A.  The Government Suppressed Evidence From Mr. Lugo When It Failed To Disclose That Testifying Government Witnesses Were Deactivated As Confidential Sources By Law Enforcement

As noted above, to prevail on a *Brady* claim the defendant must first show that the

prosecution suppressed or withheld evidence from the defendant. Id. In considering whether the government suppressed exculpatory or impeaching evidence from the defense, it is proper to impute to the prosecutor's office facts that are known to the police and other members of the investigation team. U.S. v. Wilson, 237 F.3d 827, (7th Cir. 2001). "The individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." Kyles, 514 U.S. at 437.

In U.S. v. Wilson, a key witness of the government testified that he had not tested positive for drugs while he was in the witness protection program. 237 F.3d at 831-832. However, a month after the trial, the prosecutors received notice that the witness had been terminated from the witness protection program based on the United State's Marshal's Service report that the witness had tested positive for marijuana in three separate drug tests prior to his testimony. Id. Although, after trial, the prosecutors immediately disclosed this information to the defense, the Court held that the government had suppressed or withheld this information from the defense because the U.S. Marshals were part of the team participating with the prosecution, even if their only responsibility was to keep the defendant in custody rather than participate in the investigation for the case. Id.

In this case, although it is unclear whether the prosecutor had actual knowledge that Robert O'Deneal and Christopher Morrissette had been deactivated as confidential sources during the investigation by at least one law enforcement agency, it does not matter because the DEA and KAMEG knew of their deactivation all along. This case is similar to Wilson, in that members of the prosecutor's team, including the lead agent in

the investigation, knew of facts before trial that would have been favorable to Mr. Lugo. It is clear from the record that the DEA and KAMEG new that both Morrissette and O'Deneal, the government's two star witnesses, lied to law enforcement, continued to commit crimes behind law enforcements' back, and clearly violated their Confidential Source Agreements with law enforcement. All such information is extremely favorable to the defense. However, those facts were never disclosed or communicated to the defendants.

Moreover, all law enforcement agencies that utilized these two confidential sources while investigating Mr. Lugo would have had files on each confidential source. These files contain reports and other information regarding both confidential sources. These files were also never provided to defense counsel before or during trial. Because the prosecution had actual or imputed knowledge favorable to Mr. Lugo before trial, and did not communicate or disclose that information, it is clear that the government violated the first requirement of a *Brady*.

> B. The Evidence That The Government Withheld Was Favorable to Mr. Lugo

Second, under *Brady* the defense must show that the suppressed or withheld evidence was favorable to the defendant. Moor, 408 U.S., at 792. "The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment of the defendant." Brady, 373 U.S. at 87. Impeachment evidence falls into the category of favorable evidence under *Brady*. Crivens v. Roth, 172 F.3d 991 (7th Cir. 1999) (The Court held that the prosecution had withheld favorable information when it failed to disclose information to

the defense about the criminal history of a testifying government witness.); Wilson, 237 F.3d 827 (The government admitted that evidence that a key witness failed drug tests while in the witness protection program was favorable to the defense in the light of the fact that the witness testified he had not tested positive for drugs.); Banks v. Dretke, 540 U.S. 668, 702 (2004) (he Court held the fact that one of the prosecutions key witnesses had been a paid police informant was considered favorable to the defense for impeachment purposes.)

In this case, evidence that Morrissette and O'Deneal had been deactivated for violating their confidential source agreements with law enforcement is undeniably favorable evidence. Mr. Lugo could have used this information to impeach both witnesses as well as law enforcement for their continued use of confidential sources that were deemed to be untrustworthy. Moreover, confidential source files relating to O'Deneal and Morrissette's agreements with law enforcement would also have revealed favorable information to Mr. Lugo. The favorable information that the files could have reveal include specific violations of cooperator's agreements with DEA and KAMEG, crimes committed while bound by the agreement, any write-ups by law enforcement, and other disciplinary information. Thus, because evidence that could have been used to impeach the two star prosecutorial witnesses and law enforcement is favorable to Mr. Lugo, the government violated the second requirement under *Brady*.

> C. Evidence Withheld From Mr. Lugo By The Government That Two Confidential Sources Were Deactivated By The DEA and Found To Be Untrustworthy By DEA and KAMEG Is Material Evidence

Finally under *Brady*, evidence is considered material if there is a reasonable probability that its proper disclosure would have led to a different result at trial. Whitley,

514 at 433-434.  The inquiry is whether, in light of the evidence suppressed or withheld by the government, the trial produced a verdict worthy of confidence.  Id.; United States v. Knight, 342 F.3d 697 (7th Cir. 2003).  When the reliability of a particular witness may be considered determinative of the guilt or innocence of the defendant, nondisclosure of that evidence is considered material.  Giglio, 150 U.S. at 154.  Evidence suppressed or withheld by the government that could have been used to impeach a government witness can affect the outcome of a trial, if not cumulative of other impeachment offered at trial.  Wilson 481 F.3d at 480; Simental v. Matrisciano, 363 F.3d 607, 614 (7th Cir. 2004); U.S. v. Fallon, 348 F.3d 248, 252 (7th Cir. 2003).  Evidence that provides a new basis for impeachment should not be considered cumulative and could be material.  Dretke, 540 U.S., 700-02.

       The Wilson Court held that evidence that a witness was willing to use his position in the prosecution to get even with other gang members was not the same as other impeachment evidence used at trial, including the witness's long criminal record, evidence that the witness lied all the time, and evidence that the witness was testifying as part of a deal with prosecutors.  481 F.3d at 481.  The Court considered this a "new and potentially powerful line" of questioning that could have been used to further discredit the value of the witness's testimony.  Id.  In U.S. v. Andrews, the court held that by failing to disclose evidence of drug-testing results and the discipline of government witnesses while in protective custody, as well as evidence regarding the conduct of and benefits conferred on the witnesses while in custody that might reflect on their credibility, the government deprived the defense counsel of a reasonable opportunity to challenge the witnesses' credibility.  824 F. Supp. 1273 (N.D. ILL 1993).  The Court went on to rule

that the withholding of such impeachment evidence resulted in a violation of due process, and the defendants were entitled to a new trial inasmuch as such evidence was material to the central defense strategy of attacking the government witnesses' credibility. Id.

In U.S. v. Boyd, the Seventh Circuit held that the government's failure to reveal to the defense the drug use and drug dealing by prisoner witnesses during the trial or the "continuous stream of unlawful" favors the prosecution gave those witnesses was material for purposes of establishing a *Brady* violation. 55 F.3d 239 (7th Cir. 1995). The court found that there was a reasonable probability that the jury would have acquitted the defendants on at least some counts had it disbelieved the testimony by those witnesses. Id. The jury verdict might have been different if the witnesses had not testified falsely about their continued use of drugs and/or if the government had revealed the witness' continued use of drugs and favors that the prosecution extended. Id.

Moreover, impeachment evidence of a particular witness becomes even more material when the government's case depends on the testimony of that witness. The Giglio Court held that a key witness's credibility as a witness was an important issue in the case, and evidence of any understanding of future prosecution would be relevant to that witness's credibility and the jury was entitled to know it. 150 U.S. at 92.

In this case, had Mr. Lugo known that the government had been relying on information from confidential sources that were found to be untrustworthy and deactivated, it would have afforded Mr. Lugo a unique basis for impeachment. Further, it would have allowed him to incorporate such material evidence into the theory of his case. While it is true that Mr. Lugo did have a limited opportunity to impeach both Morrissette and O'Deneal regarding their prior criminal record and plea agreement with the

government, Mr. Lugo was deprived the opportunity to question Morrissette, O'Deneal, and law enforcement regarding the confidential sources' deactivation, violations of their agreements and other relevant information that the government possessed.. As in Wilson, this information is not cumulative impeachment evidence and represents a powerful new line of inquiry that could have been used to undermine the value of Morrissette and O'Deneal's testimony and the evidence that the government presented at trial.

Additionally, as in Giglio, Morrissette and O'Deneal's testimony was critical to the prosecution in linking Mr. Lugo to Counts 3 and 4 of the indictment, thus their credibility as witnesses was the crux of the government's case. Evidence of their wrongdoing and deactivation by law enforcement was clearly relevant to their credibility and the jury was certainly entitled to hear it. The prosecution heavily relied on Morrissette and O'Deneal to setup taped phone conversations with Mr. Lugo. These conversations were critical in linking Mr. Lugo to the alleged conspiracy as well as Counts 3 and 4 of the indictment. During cross-examination, Morrissette admitted that he personally came up with his own dialogue with Mr. Lugo on a taped conversation from January, 2006. Had the jury heard evidence that Morrissette violated his agreement with law enforcement, was found to be untrustworthy, and deactivated by DEA as a confidential source, there is a reasonable probability the jury would have viewed this taped conversation much differently.

Furthermore, the fact that law enforcement continued to rely on information provided by deactivated confidential sources is pertinent to the credibility of the investigation as a whole. Had the jury known that both DEA and KAMEG deemed Morrissette and O'Deneal untrustworthy there is a reasonable probability that the

outcome of this trial would have been different at least on some of the counts of the indictment. The government presented a substantial amount of critical evidence that derived from law enforcement's reliance on Morrissette and O'Deneal. The continued reliance on deactivated confidential sources throughout the course of the investigation could have reasonably undermined the jury's confidence in the investigation and the court's confidence in the verdict.

Evidence the government withheld regarding the confidential sources personnel files was material under *Brady*. Based on the testimony of the agents at trial, each confidential source had a file which summarized their performance as a confidential source, including any violations of their confidential source agreements and whether law enforcement penalized the source for such transgressions. Again, if Mr. Lugo had been provided the file for each confidential source, he would have been able to highlight the continued violation of confidential source's agreement with law enforcement and how law enforcement documented any potential violation. This evidence would have allowed Mr. Lugo to further impeach each confidential source that testified at trial, as well as law enforcement's continued reliance on untrustworthy sources. Thus, there is a strong probability that the jury would have ruled in a different way and disregard any evidence offered by each source.

Finally, had the government provided Mr. Lugo with the various law enforcement files on each confidential source, Mr. Lugo would have been able to establish that Morrissette gave false testimony during trial. At one point during trail, Mr. Lugo's defense counsel highlighted the fact that Morrissette had violated his confidential source agreement and specifically asked Morrissette if he had ever signed a written agreement

with any law enforcement agency when he became a confidential source. Morrissette responded that he had never entered into a written agreement with law enforcement when he became a confidential source. However, while testifying, agents from the DEA and KAMEG established that all confidential sources are given a list of rules and a written agreement to sign when they become a confidential source. Had Mr. Lugo had Morrissette's confidential source file, he would have been able to prove that Morrissette had given false testimony.

A new trial is required if the false testimony could have in any reasonable likelihood affected the judgment of the jury. Napue, supra, at 271, 79 S.Ct. at 1178. Because the government withheld favorable impeachment evidence that was material to the defense, they committed a *Brady* violation that resulted in a Due Process violation, and Mr. Lugo is entitled to a new trial.

WHEREFORE, the Petitioner, Mr. Lugo is requesting that this Honorable Court find that the government committed a *Brady* and *Giglio* violation and vacate the jury's verdict and grant Mr. Lugo a new trial.

    Respectfully submitted,

By:   /S/ Gal Pissetzky
    Gal Pissetzky, Esq.
    Attorney for Defendant,
    Gerardo Lugo

**GAL PISSETZKY**
Pissetzky, Berliner & Zhitnitsky
53 W. Jackson Blvd.
Suite 1403
Chicago, Illinois 60604
(312) 566-9900

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | 07CR20002 |
| | ) | |
| GERARDO LUGO | ) | |
| Defendant | ) | |

## CERTIFICATE OF SERVICE

The undersigned, Gal Pissetzky, hereby certifies that in accordance with Fed.R.Crim.P. 49, Fed.R.Civ.P. 5, and the General Order on Electronic Case Filing (ECF), the

**MOTION TO VACATE JURY VERDICT AND GRANT A NEW TRIAL AS A RESULT OF A *BRADY* AND *GIGLIO* VIOLATIONS BY THE GOVERNMENT**

was served pursuant to the district court's ECF filers to the following:

Timothy Bass
Assistant United States Attorney
201 S. Vine
Urbana, IL 601801

Respectfully submitted,

/s/ Gal Pissetzky
Gal Pissetzky
One of Mr. Lugo's lawyers
53 W. Jackson Blvd., Suite 1403
Chicago, IL 60604
(312)566-9900